# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CHARLES C. PETERSON,

     Petitioner,

v.                              Case No. 8:19-cv-987-KKM-AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

## ORDER

Charles C. Peterson filed a petition challenging his state court conviction for first-degree murder under 28 U.S.C. § 2254. (Doc. 1.) Having considered the timely petition, (Doc. 1),[1] and the response in opposition, (Doc. 10), the Court denies the petition and declines to issue a certificate of appealability.

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). The state court vacated Peterson's capital sentence and resentenced him to life without parole on May 4, 2018. (Doc. 11-12 at 750–53.) Peterson did not appeal the new sentence and the time to appeal expired thirty days later on June 4, 2018. Thus, the limitation period started to run the next day on June 6, 2018. *See* § 2244(d)(1)(A). Fla. R. App. P. 9.140(b)(3). The limitation period ran 321 days until April 22, 2019, when Peterson placed in the hands of prison officials for mailing his § 2254 petition. (Doc. 1 at 1) *See Ferreira v. Sec'y, Dep't Corrs.*, 494 F.3d 1286, 1292–93 (11th Cir. 2007).

# I. BACKGROUND

## A. Procedural Background

On July 27, 2005, a jury found Peterson guilty of first-degree murder and two days later recommended a sentence of death, and, on January 6, 2006, the trial court sentenced Peterson to death. (Docs. 11-2 at 393–95 and 11-3 at 175–78.) The Florida Supreme Court affirmed the conviction and sentence in a written opinion, and the United States Supreme Court denied his petition for a writ of certiorari. *See Peterson v. State*, 2 So. 3d 146 (Fla. 2009), *cert. denied*, 558 U.S. 885 (2009). After an evidentiary hearing, the post-conviction court denied Peterson relief in his first collateral challenge, (Doc. 11-10 at 177–223), and the Florida Supreme Court affirmed in a written opinion, *Peterson v. State*, 154 So. 3d 275 (Fla. 2014). Later, the post-conviction court granted in part Peterson's successive motion for post-conviction relief, vacated his death sentence to comply with *Hurst v. Florida*, 577 U.S. 92 (2016), and resentenced Peterson to life without parole, (Doc. 11-12 at 741–48, 750–53). Peterson did not appeal that ruling.

Before the state court vacated Peterson's death sentence, Peterson filed a §2254 petition. *See Peterson v. Sec'y, Dep't Corrs.*, No. 8:14-cv-3237-CEH-TGW, Doc. 1. The Honorable Charlene Honeywell dismissed the earlier petition after the state court vacated the death sentence because the judgment of conviction was no longer final. *Id.*, Doc. 27. After the new sentence became final, Peterson filed this second § 2254 petition.

2

## B. Factual Background[2]

On Christmas Eve of 1997, an assistant manager at a Big Lots store in St. Petersburg, Florida, heard a "ruckus" outside her office after the store had closed. *See Peterson*, 2 So. 3d at 148. When the assistant manager opened the door, a male confronted her and pointed a gun at her. *Id.* Another employee, who was in the office and heard a noise like firecrackers or furniture banging, observed a nylon stocking covering the man's face and off-white latex gloves covering the man's hands. *Id.*

The armed man escorted the two employees, and a third employee who also was in the office, to a stockroom and held a gun to the assistant manager's head. *Id.* As they walked to the stockroom, the assistant manager saw a fourth employee lying lifeless on the floor. *Id.* The armed man instructed the three employees plus another employee who had entered to get down on their hands and knees. *Id.* The man pointed the gun at the assistant manager's temple and told her not to look at him. *Id.* He then walked the assistant manager back to the office where he instructed her to fill a backpack with "all of the large money." *Id.* After collecting the money, the man moved all the employees back to the stockroom and instructed them to lie next to the employee lying on the floor. *Id.* The man left through an emergency exit in the back of the store. *Id.*

---

[2] The factual background derives from the Florida Supreme Court's opinion affirming his conviction and original death sentence. *Peterson*, 2 So. 3d at 148–52.

The employee lying on the floor died of a gunshot wound to the torso. *Id.* The assistant manager identified Peterson as the armed robber in a photographic lineup. *Id.* Another employee could not identify Peterson as the armed robber but identified Peterson as an individual whom she suspected stole from the store earlier that day because he wore the same clothes as that individual. *Id.* A customer identified Peterson in a photographic lineup as a man whom the customer saw pacing in the back of the store on the night of the murder. *Id.*

After securing search warrants, police searched the home of Peterson's father, the home of Peterson's sister, and two cars belonging to Peterson. Police seized two nylon stockings from a dresser in a bedroom, three latex gloves from a kitchen drawer, and a gray nylon cap and a piece of nylon stocking from the two cars. *Id.*

Sometime between 1996 and 1998, Peterson's girlfriend found cash in bank wrappers underneath the sink in their home. *Id.* She also saw money in a safe and found a gun in a bedroom drawer with Peterson's belongings. *Id.* She denied that the gun belonged to her or her adult son, denied leaving pantyhose in Peterson's car, and did not remember Peterson ever wearing a "wave cap" or processing his hair in a manner that would have required a "wave cap." *Id.*

At trial, the State relied on evidence of other crimes, wrongs, or acts under § 90.404(2), Fla. Stat., specifically that Peterson had robbed three other businesses in the

Tampa Bay area around the same time and in substantially similar manners: a Family Dollar store, a Phar-Mor store, and a McCrory's Store. *Id.* at 149–50. An employee who worked at the Family Dollar locked the doors for the evening and encountered a man with a gun in the store's office. *Id.* at 150. The man wore a thick stocking over his face, demanded "big money," and repeatedly told the employee and her coworker not to look at him. *Id.* The man forced the employee and her coworker to lie face down on the floor. *Id.* To avoid admission of evidence of a sexual battery, the parties stipulated that police recovered DNA from the Family Dollar robbery. *Id.* DNA from the store matched Peterson's DNA. *Id.*

An employee who worked at the Phar-Mor closed the store for the evening and encountered a man armed with a gun wearing a black nylon mask and latex gloves. *Id.* The man pointed the gun at the employee's head, ordered her not to look at him, forced the employee and her coworkers into a back room, and instructed them to lie down. *Id.* The man tied up two employees with electrical tape, plastic strapping from boxes, and a telephone cord, and directed the third employee to unlock an office and fill manila envelopes with money. *Id.* Mitochondrial DNA from hair on a piece of electrical tape was consistent with Peterson's mitochondrial DNA. *Id.* Shoe prints at the store matched prints

from shoes seized from a storage unit rented by Peterson. *Id.* Also, Peterson's girlfriend and her brother identified Peterson in surveillance video from the store. *Id.* at 150–51.[3]

In yet another similar incident, an employee who worked at McCrory's went to the back of the store to smoke a cigarette and take out trash and encountered a man with a stocking covering his face. *Id.* at 151. The man pointed a small handgun at the employee's head, told her, "Don't look at me or I'll kill you," and forced her to open a safe in an office. *Id.* When the man learned that the store was still open, he became aggravated, collected the money in the safe, took the employee to a bathroom, forced the employee lie face down, and exited through the back door. *Id.* The employee identified Peterson as the robber in a photographic lineup. *Id.* Police seized a green bank bag from the home of Peterson's father. *Id.* The bank bag contained a white plastic McCrory's bag, documents including checks, a bank deposit slip, and charge card receipts bearing McCrory's store number[4], and a pellet gun. *Id.* The employee identified the green bag as the type of bag kept in the safe and

---

[3] A DNA expert opined that: "Peterson and his maternal relatives could not be eliminated as a contributor of that hair." (Doc. 15-2 at 96.) A laboratory analyst opined that a shoeprint at the store "could have been made" by the shoes seized from the locker. (Doc. 11-6 at 195–96.) On cross-examination, Peterson's girlfriend and her brother agreed that they could not see the robber's face on the surveillance video. (Docs. 11-5 at 578–79 and 11-6 at 1423.) However, Peterson's girlfriend testified that she saw Peterson everyday for two years and had observed how he walks. (Doc. 11-5 at 570.) Also, the robber wore a black Tommy Hilfiger shirt that she recognized because she had given Peterson the shirt. (Doc. 11-5 at 565, 571.) Police found the black Tommy Hilfiger shirt in the storage unit rented by Peterson. (Doc. 11-6 at 85.)

[4] Also, the bag contained a credit card slip, a receipt, and two checks dated August 29, 1998, the date of the McCrory's robbery. (Doc. 11-6 at 247, 268–70.)

identified the documents as papers kept in the green bag. *Id.* A fingerprint and a palm print found on the documents matched Peterson's prints. *Id.*

## II. LEGAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the

relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also*

*Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the

facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court

in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d)

11

provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "[C]learly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Id.* at 412. A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

For purposes of § 2254(d)(2), a state court's findings of fact are presumed correct. *See Rolling v. Crosby*, 438 F.3d 1296, 1301 (11th Cir. 2006) ("The factual findings of the

12

state court, including the credibility findings, are presumed to be correct . . . ."). A petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). When the relevant state-court decision is not accompanied with reasons for the

decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Id.* The state may contest "the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that

14

some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III. INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

Peterson brings several claims for ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed in his federal habeas petition, Peterson must not only show both deficient performance by his counsel and prejudice resulting from those errors but also that the state court's determination of the *Strickland* test was unreasonable. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally

competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

As stated already, "[t]he question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal habeas petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential,

and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV. <u>ANALYSIS</u>

### A. Ground One

Peterson asserts that the state court violated his federal right to a fair trial by admitting evidence of the other robberies. (Doc. 1 at 5–13.) He contends that the other robberies were not sufficiently similar to the charged crime, the probative value of the collateral crimes was outweighed by the danger of unfair prejudice, and the evidence of the collateral crimes became a feature at trial. (Doc. 1 at 5–6.)

The Respondent asserts that the claim is procedurally barred from federal review because Peterson failed to exhaust the claim. (Doc. 10 at 23–26.) Peterson presented a similar claim as his first issue on direct appeal but pressed that issue under state law—not as the violation of a federally protected right. (Doc. 11-7 at 560–76.) Because Peterson failed to alert the Florida Supreme Court to the federal nature of his claim, he cannot now bring that claim in his federal habeas petition. *See Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

17

Because Peterson could have raised the federal claim on direct appeal, he is barred from raising the claim in a post-conviction challenge in state court. *See* Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Because Peterson cannot now return to state court to raise the claim in a post-conviction challenge, the claim is procedurally defaulted in federal court. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless 'judicial ping-pong' and just treat those claims now barred by state law as no basis for federal habeas relief."). And Peterson fails to establish either cause and prejudice or establish a fundamental miscarriage of justice to excuse the procedural default. (Doc. 1 at 13–14.) Consequently, the claim is procedurally barred from federal review. *See Wright*, 169 F.3d at 703.

Also, even though in his federal petition Peterson summarily asserts that the state court's ruling violated his federal rights, (Doc. 1 at 5), Peterson argues that the state court's ruling violated state rules governing the admission of evidence, (Doc. 1 at 6–13). Peterson applies the standards in §§ 90.403 and 90.404, Fla. Stat., to argue that the collateral crime evidence was not sufficiently similar to the charged crime and impermissibly became a feature at trial. (Doc. 1 at 6–13) "[I]t is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[A] federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68. "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is 'couched in terms of equal protection and due process.'" *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) (citation omitted). Because Peterson asserts a claim based on a violation of state law, the claim is not cognizable on federal habeas.

Ground One is denied.

## B. Ground Two

Peterson asserts that trial counsel was ineffective for neither challenging for cause nor exercising a peremptory challenge to dismiss Juror A.J., Juror M.B., Juror T.W., Juror N.T., and Juror C.S. (Doc. 1 at 14–29.)

### 1. Failure to Challenge for Cause

Peterson asserts that trial counsel was ineffective for not challenging for cause Juror A.J., Juror M.B., Juror T.W., Juror N.T., and Juror C.S. (Doc. 1 at 14–29.) To satisfy *Strickland*'s prejudice prong, a Florida court requires a defendant to demonstrate that a juror served with "actual bias." *Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007) ("We therefore hold that where a postconviction motion alleges that trial counsel was ineffective

19

for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased."). "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—*i.e.*, that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." *Carratelli*, 961 So. 2d at 324. "*Carratelli*'s actual bias test is arguably consistent with *Strickland*." *Owen v. Fla. Dep't Corrs.*, 686 F.3d 1181, 1201 (11th Cir. 2012); *see also Fennell v. Sec'y, Fla. Dep't Corrs.*, 582 F. App'x 828, 834 (11th Cir. 2014) (evaluating *Strickland* prejudice under *Carratelli's* actual bias standard for a claim that trial counsel deficiently performed by not moving to strike a juror for cause).

The Florida Supreme Court determined that Peterson failed to allege that the challenged jurors served with "actual bias." *Peterson*, 154 So. 3d at 281. In his postconviction motion, Peterson failed to recite the "actual bias" standard in *Carratelli* and apply the standard by asserting that a juror served with "actual bias." (Doc. 11-8 at 378–96.) Because Peterson failed to allege sufficient facts to demonstrate prejudice under *Strickland*, the postconviction court did not unreasonably deny the claim. *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011) ("[A]n Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim . . . . We therefore

20

must review the merits determination of the Court of Criminal Appeals under the deferential standards set forth in AEDPA [ ].").

The Florida Supreme Court further determined that "review of the record does not uncover any indication that a biased juror sat on Peterson's jury," and "[b]ecause Peterson has not demonstrated actual bias, the postconviction court properly denied the claim." *Peterson*, 154 So. 3d at 281.Because the record supports the post-conviction court's determination that no juror served with "actual bias," the Florida Supreme Court did not unreasonably deny the claim. (Doc. 11-10 at 181)

Also, even if the "actual bias" standard under *Carratelli* is contrary to the prejudice standard under *Strickland*, and this Court must review the ineffective assistance of counsel claim de novo, Peterson failed to demonstrate a reasonable probability that the outcome at trial would change if trial counsel had challenged the jurors. *Strickland*, 466 U.S. at 694. *Owen*, 686 F.3d at 1201 ("[W]e need not decide whether the *Carratelli* actual-bias test for prejudice imposes a higher burden or contradicts the governing *Strickland* prejudice standard. Even if the *Carratelli* prejudice test [ ] were contrary to *Strickland*, and thus our review were de novo, we conclude that Owen cannot prevail on his ineffective assistance claim.").

### a. Juror A.J.

The post-conviction court concluded that trial counsel could not have successfully challenged Juror A.J. for cause. Juror A.J. was a young, African American female with ambivalent feelings about the death penalty. (Doc. 11-10 at 182.) She was also a victim of rape when she was sixteen. But the State did not introduce evidence that Peterson committed a rape during the Family Dollar robbery in the guilt phase of the trial. (Doc. 11-10 at 183.) And although Juror A.J. expressed her belief that the perpetrator of her rape received a lenient sentence, the State introduced evidence in the penalty phase that Peterson received life sentences for his sex crimes. (Doc. 11-10 at 183.) In his post-conviction challenge, Peterson contended that he looked like the perpetrator of Juror A.J.'s rape; the post-conviction court concluded otherwise, noting that Peterson was shorter and markedly thinner after reviewing a booking photograph of the perpetrator. (Doc. 11-10 at 182.) Lastly, Juror A.J.'s perpetrator was charged with unlawful sex with a minor, which Peterson has not established is similar to the rape he committed during the Family Dollar robbery. (Doc. 11-10 at 182.)

Peterson also argued that Juror A.J. should have been struck for cause because her brother-in-law was a corrections officer at the jail. But the postconviction court rejected this argument because her brother-in-law did not investigate crime and Juror A.J. shared no blood relationship with him. (Doc. 11-10 at 183.) Lastly, even though a cousin of Juror

A.J.'s husband was shot in St. Petersburg, police did not contact Juror A.J. concerning the shooting, and the record did not clearly demonstrate that a prosecutor charged the shooter with a crime. (Doc. 11-10 at 183.) The post-conviction court thus concluded that "Juror A.J. was clear and convincing in her certainty that her past victimization would have no effect on her determination of Peterson's case and that she would accord law enforcement officers no special credibility." (Doc. 11-10 at 183.)

As an initial matter, the record supports the post-conviction court's determination of facts (Docs. 11-5 at 95–103 and 11-11 at 64–65, 67)[5], so Peterson cannot succeed here on the ground that the post-conviction court unreasonably determined a fact. 28 U.S.C. § 2254(d)(2). During jury selection, Juror A.J. stated that she held no general belief about police officers based on the police's investigation of the shooting of her husband's cousin, (Doc. 11-5 at 97); asserted that the prosecutors, the defense attorneys, and the trial judge treated her fairly in the rape prosecution, (Doc. 11-5 at 98–103); and confirmed that she could fairly decide Peterson's case, (Doc. 11-5 at 98, 103). Peterson even appears to admit that Juror A.J. could not have been stricken for cause. (Doc. 1 at 15 (conceding that Juror A.J. "may not have expressed any feelings which would have conclusively warranted a cause challenge").) Because Peterson failed to demonstrate that Juror A.J. held biased or

---

[5] The post-conviction court appears to have taken judicial notice of records in the perpetrator's state court case. The post-conviction court's factual determination is presumed correct, and Peterson fails to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

23

prejudiced beliefs that would have prevented her from returning a verdict based on the law and evidence, trial counsel was not ineffective for not seeking to strike her for cause, and the post-conviction court did not unreasonably deny Peterson's claim. *See* § 913.03(10), Fla. Stat.; *accord United States v. Tsarnaev*, 142 S. Ct. 1024, 1034 (2022) ("A trial court protects the defendant's Sixth Amendment right [to a trial by an impartial jury] by ensuring that jurors have 'no bias or prejudice that would prevent them from returning a verdict according to the law and evidence.'" (citation omitted)).

### b. Juror M.B.

The post-conviction court concluded that trial counsel could not have successfully challenged Juror M.B. for cause and thus Peterson could not show counsel performed deficiently or that he suffered any prejudice. In response to a question about gory or gruesome evidence at trial, Juror M.B. expressed concern that she had a "faint heart." (Doc. 11-10 at 183–84.) To be sure, during trial, the defense objected to the admission of the photographs of the shooting victim as inflammatory, (Doc. 11-5 at 500), and the trial judge overruled the objection after finding that "there is nothing particularly gory in the pictures," (Doc. 11-5 at 505). The State ultimately introduced into evidence only five photographs of the victim who had been shot once and did not introduce photographs of the autopsy. (Doc. 11-10 at 184.) Juror M.B. also expressed dissatisfaction with the police's failure to investigate children who knocked her son off his bike. But the State would suffer any bias

that Juror M.B. held against the police on account of that incident, and Juror M.B. confirmed that the incident would not impact her decision in Peterson's case. (Doc. 11-10 at 184.)

Because the record supports the post-conviction court's determination of facts related to Juror M.B., (Docs. 11-4 at 260–62, 560–61, 11-5 at 511–12 and 11-6 at 62–71), the post-conviction court did not unreasonably determine a fact, *See* 28 U.S.C. § 2254(d)(2). Juror M.B. agreed that "with [her] sensitivity, [she] would be better on some other kind of case," but never stated that her emotions would interfere with her ability to be fair and impartial. (Doc. 11-4 at 561.) Further, the record does not show that Juror M.B. became upset during trial. Lastly, Juror M.B. confirmed that she could evaluate the credibility of a police officer like any other witness. (Doc. 11-4 at 261–64.) Because Peterson failed to demonstrate that Juror M.B. held biased or prejudiced beliefs that would have prevented her from returning a verdict based on the law and evidence, trial counsel was not ineffective for not moving to strike her for cause, and the post-conviction court did not unreasonably deny the claim. § 913.03(10), Fla. Stat.; *Tsarnaev*, 142 S. Ct. at 1034.

### c. Juror T.W.

The post-conviction court concluded that trial counsel could not have successfully challenged Juror T.W. for cause despite his several connections to the legal and law enforcement professions. Specifically, Juror T.W.'s sister-in-law was a lawyer, his brother

25

and nephew worked as jury consultants, and he worked at events with the police department and the sheriff's office. But the post-conviction court ruled that his relation to a lawyer did not disqualify him as a juror, the private jury consultation business was not a law enforcement agency and the business did not assist the State with criminal cases, and Juror T.W. managed events for the City of Clearwater which relied on the police for security and he did not assist the police with investigation and prosecution of crimes. (Doc. 11-10 at 184–85.) Additionally, even though Juror T.W. described his "good friendship" with a crime scene technician who worked at the sheriff's office, he confirmed that he would treat a police officer like any other witness. (Doc. 11-10 at 185.) Lastly, Juror T.W. owned firearms, but the post-conviction court concluded that he could have felt more sympathetic toward Peterson's ownership of a gun than someone who does not own a gun. (Doc. 11-10 at 185.)

Juror T.W. remarked to the trial judge and another potential juror on a lunch break during voir dire that "the number of people on the venire not in favor of the death penalty seemed to exceed that in the general community." The post-conviction court concluded that the remark was likely accurate and unrelated to Peterson's case. (Doc. 11-10 at 186.) Lastly, even though Juror T.W. later explained to potential jurors the difference between premeditated murder and felony murder, the trial judge asked Juror T.W. about his comment in the presence of the parties. (Doc. 11-10 at 185.) After consulting with

Peterson, trial counsel advised that Peterson did not want to remove Juror T.W. and instead wanted the trial judge to remind the jury not to speak about the case before deliberation. (Doc. 11-10 at 185.) Also, both the prosecutor and trial counsel provided the same explanation about premeditated murder and felony murder to potential jurors during jury selection, and the trial judge instructed the potential jurors that the court would instruct the jury on the law. (Doc. 11-10 at 186.)

Because the record supports the post-conviction court's determination of facts (Doc. 11-4 at 121–29, 255, 415–18, 442–45, 507 and 11-5 at 165–66, 233–40), the post-conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2). Whether Juror T.W. could not serve as a juror because his sister-in-law was a lawyer is an issue of state law, and a state court's determination of state law receives deference in federal court. § 913.03, Fla. Stat.; *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts." (italics in original)). Juror T.W. agreed that he could evaluate the credibility of a police officer like any other witness (Doc. 11-4 at 417)[6] and denied that his discussions with his brother and his nephew about jury selection would substantially

---

[6] Juror T.W. identified himself as a "victim" of robbery but explained that he went outside to his driveway because his car door was open, a male exited the car, he screamed, and the male ran away. (Doc. 11-4 at 416.) He also explained that his wife had been "grabbed a couple times" and the perpetrator "got away both times," but the first time occurred before she met him and she did not contact police after the second. (Doc. 11-4 at 415.)

influence him in this case. (Doc. 11-4 at 418.) When Juror T.W. remarked during lunch about the number of people on the venire who opposed the death penalty, the trial judge immediately left to avoid contact with Juror T.W. (Doc. 11-4 at 121.) The post-conviction court reasonably determined that the remark was likely accurate. After the trial judge interviewed Juror T.W. about his remark concerning premediated murder and felony murder, trial counsel consulted with Peterson and asked the trial judge to remind the potential jurors not to discuss the case but asked that no juror be removed. (Doc. 11-5 at 239–40.) During jury selection, both the prosecutor and trial counsel spoke about the legal differences between premediated murder and felony murder. (Docs. 11-4 at 442–43 and 11-5 at 165–66.)

Because Peterson failed to demonstrate that Juror T.W. held biased or prejudiced beliefs that would have prevented him from returning a verdict based on the law and evidence, trial counsel was not ineffective for not moving to strike him, and the post-conviction court did not unreasonably deny the claim. *See Tsarnaev*, 142 S. Ct. at 1034.

### d. Juror N.T.

The post-conviction court concluded that trial counsel could not have successfully challenged Juror N.T. for cause. Juror N.T. worked closely with the police and the prosecutor's office at a school for juvenile delinquents, but Peterson failed to demonstrate that Juror N.T.'s job as a counselor was "akin to being in law enforcement." (Doc. 11-10

28

at 187.) Even though Juror N.T. suggested that she wanted to hear from Peterson, she unequivocally agreed that the prosecutor carried the burden of proof, that she must presume Peterson innocent, and that she would not hold Peterson's failure to testify against him. (Doc. 11-10 at 187.) Even though Juror N.T. opined that she would not want her family member to suffer arrest because the arrest would tarnish her name, trial counsel opined that Juror N.T., who was a young, African American female with mixed feelings about the death penalty, was favorable for the defense. (Doc. 11-10 at 186–87.) Lastly, even though Juror N.T. told the newspaper after the verdict that her verdict might have changed if Peterson had testified, the state supreme court concluded on direct appeal that juror's consideration of Peterson's failure to testify during deliberation inhered in the verdict. (Doc. 11-10 at 187.) *Peterson*, 2 So. 3d at 159 n.6. The post-conviction court refused to consider the post-verdict comments to evaluate trial counsel's performance during jury selection. (Doc. 11-10 at 187–88.)

Because the record supports the post-conviction court's determination of facts (Docs. 11-4 at 491–98, 567–71 and 11-11 at 535–45), the post-conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2). During jury selection, Juror N.T. agreed that the prosecution had the burden of proof, that she would presume Peterson innocent, and that she would not hold his failure to testify against him. (Doc. 11-4 at 570–71.) At the evidentiary hearing, trial counsel testified that Juror N.T. expressed mixed

feelings about the death penalty favorable for the defense. (Doc. 11-12 at 200–01.) Peterson failed to overcome the presumption that trial counsel pursued "sound trial strategy." *Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (citation omitted)). Trial counsel could not have known during jury selection about Juror N.T.'s post-verdict comment, and "[a] fair assessment of attorney performance requires that every effort be made . . . to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Because Peterson failed to demonstrate that Juror N.T. held biased or prejudiced beliefs that would have prevented her from returning a verdict based on the law and evidence, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *See Tsarnaev*, 142 S. Ct. at 1034.

### e. Juror C.S.

The post-conviction court concluded that trial counsel could not have successfully challenged Juror C.S. for cause for the following reasons. Even though Juror C.S. expressed her desire to listen to both parties, the statement in context meant that Juror C.S. agreed to consider any evidence or arguments by the defense before deciding the case. (Doc. 11-10 at 188.) The post-conviction court concluded that a challenge would not have succeeded

because trial counsel attempted to move to strike another juror for the same reason, and the trial court denied the challenge. (Doc. 11-10 at 188.) Also, Juror C.S. explained that she was "on the fence" about the death penalty. (Doc. 11-10 at 188.)

Because the record supports the post-conviction court's determination of facts, the post-conviction court did not unreasonably determine those facts. 28 U.S.C. § 2254(d)(2). (Doc. 11-5 at 136–39, 176–80, 191–93) During jury selection, Juror C.S. stated that she would follow the law, that she would not require Peterson to testify, and that she wanted to hear from defense witnesses. (Doc. 11-5 at 179–80.) Also, Juror C.S. expressed reservations about the death penalty. (Doc. 11-5 at 136) The trial court denied the defense's challenge to Juror B.D. for cause, even though Juror B.D. also stated that she would like to hear from both the prosecution and the defense. (Doc. 11-5 at 191–92.) Like Juror C.S., Juror B.D. agreed to follow the law. (Doc. 11-5 at 191–92.)

Because Peterson failed to demonstrate that Juror C.S. held biased or prejudiced beliefs that would have prevented her from returning a verdict based on the law and evidence and Peterson failed to overcome the presumption that trial counsel pursued "sound trial strategy," *Strickland*, 466 U.S. at 689, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. § 913.03(10), Fla. Stat.; *see Tsarnaev*, 142 S. Ct. at 1034.

31

## 2. Failure to Exercise Peremptory Challenges

Peterson asserts that trial counsel was ineffective for not exercising a peremptory challenge against Juror A.J., Juror M.B., Juror T.W., Juror N.T., and Juror C.S. (Doc. 1 at 14–29.) The state supreme court denied the claim after concluding that trial counsel exercised reasonable trial strategy by selecting the jurors who all held beliefs favorable to the defense in the penalty phase. *Peterson*, 154 So. 3d at 282. Also, the state supreme court concluded that Peterson's claim of prejudice under *Strickland* was speculative because he failed to point to any potential juror with better qualifications than any seated juror. *Id.* Lastly, the state supreme court concluded that the record undermined the claim because Peterson "heavily participated" in jury selection and expressed his preferences to trial counsel to keep certain jurors. *Id.*

At the evidentiary hearing, trial counsel testified that he had selected jurors in approximately eighty capital cases and believed that the sentencing recommendation of a potential juror was "the most important to [him]." (Doc. 11-12 at 194–95.) In this case, trial counsel sometimes accepted a juror who was unfavorable to the defense for the guilt phase but favorable to the defense for the penalty phase. (Doc. 11-12 at 196, 209–10.)

Trial counsel testified that Juror A.J. did not feel strongly either in support of or against the death penalty. (Doc. 11-12 at 198–99.) Juror M.B. informed the parties that: "'Death is a difficult decision. The evidence is really going to have to be outstanding' for

32

her to vote for death." (Doc. 11-12 at 199.) Juror T.W. commented: "Well, yeah, I could vote for death if they kill a correctional guard," suggesting that he held a "little bit higher standard" for the death penalty. (Doc. 11-12 at 201.) Juror N.T. informed that "she had mixed feelings regarding the death penalty." (Doc. 11-12 at 201.) Also, Juror C.S. informed that "she was on the fence about the death penalty." (Doc. 11-12 at 201.) Trial counsel concluded that all five jurors expressed opinions about the death penalty favorable to the defense. (Doc. 11-12 at 201.)

Trial counsel further testified that, after jury selection concluded, trial counsel consulted with co-counsel and Peterson about what type of juror would benefit Peterson's defense. (Doc. 11-12 at 208.) During the exercise of peremptory challenges, trial counsel continued to consult with Peterson and co-counsel. (Doc. 11-12 at 209.) Peterson told trial counsel that wanted to select Juror A.J. and Juror N.T. (Doc. 11-12 at 208.) Before jury selection concluded, trial counsel, co-counsel, and Peterson agreed that the selected jurors were "the best [they] [could] do." (Doc. 11-12 at 210.) The record supports the state supreme court's determination of facts, the state supreme court did not unreasonably determine a fact, 28 U.S.C. § 2254(d)(2), and Peterson fails to rebut those findings of fact with clear and convincing evidence, *id.* § 2254(e)(1).

"[T]rial counsel may validly select jurors he or she believes are open to life imprisonment or are receptive to a particular mitigation defense." *Harvey v. Warden,*

*Union Corr. Instit.*, 629 F.3d 1228, 1244 (11th Cir. 2011) (citation omitted). "The attorney's actions during voir dire are considered to be a matter of trial strategy." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). "'[L]awyers experienced in the trial of capital cases have widely varying views about addressing the delicate balance between the disqualification of jurors whose personal beliefs prevent them from ever imposing the penalty of death . . ., and those who would automatically recommend that sentence if they found the defendant guilty.'" *Neill v. Gibson*, 278 F.3d 1044, 1055 (10th Cir. 2001) (citation omitted).

Because experienced trial counsel reasonably selected all five jurors because the jurors expressed opinions about the death penalty favorable to the defense, the state supreme court did not unreasonably apply *Strickland*. 466 U.S. at 681 ("Among the factors relevant to deciding whether particular strategic choices are reasonable are the experience of the attorney, the inconsistency of unpursued and pursued lines of defense, and the potential for prejudice from taking an unpursued line of defense."). *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987) ("A strategic decision by defense counsel will be held to constitute ineffective assistance 'only if it was so patently unreasonable that no competent attorney would have chosen it.'") (citation omitted).

Even if trial counsel should have exercised a peremptory challenge, Peterson could not demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In his post-conviction motion, (Doc. 11-8 at 378–96), and his brief after the evidentiary hearing, (Doc. 11-9 at 65–89), Peterson failed both to identify a potential juror who would have replaced the challenged juror and to explain how exercising a peremptory challenge would have changed the outcome at trial. Because speculation cannot support an ineffective assistance of counsel claim, the state court did not unreasonably deny the claim. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992).

Ground two is denied.

## C. Ground Three

Peterson asserts the following eight ineffective assistance of counsel claims.

### 1. Failure to object to comments by the prosecutor during jury selection

Peterson asserts that trial counsel was ineffective for not objecting to comments by the prosecutor during jury selection suggesting that the legislature had determined that death was the appropriate punishment for Peterson. (Doc. 1 at 31–33.)

Because the state court vacated Peterson's death sentence and resentenced him to life (Doc. 11-12 at 750–53) and the challenged comments concern only the death penalty, Peterson can not demonstrate "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Even so, the claim is meritless. In the first challenged comment, the prosecutor told potential jurors that, because each juror may have a "different version of what [heinous] was," the legislature had defined different circumstances when a person could be punished with death. (Doc. 1 at 31.) The prosecutor confirmed with a potential juror that the juror could follow the legislature's definition of heinous, even if the juror's definition was different. (Doc. 1 at 31–32.) In the second challenged comment, the prosecutor clarified with another potential juror: "I guess where we need to go, Miss [D.], is in the State of Florida[,] the legislature has indicated that under certain circumstances, death is the appropriate punishment . . . ." (Doc. 1 at 32.)

In the third challenged comment, the prosecutor addressed a potential juror: "You indicated that you would have to look at things and feel whether or not it's appropriate, and we've had discussions about how the legislature has kind of taken that out of your hands a bit." (Doc. 1 at 32–33.) The prosecutor told the potential juror, "[t]hat would be the law in the State of Florida," and asked whether the juror could follow the law. (Doc. 1 at 33.) In the fourth challenged comment, the prosecutor asked a potential juror: "[T]he legislature has mandated for us whether or not death is appropriate, and if you found it was appropriate, could you make a death recommendation?" (Doc. 1 at 33.) The potential juror

36

responded that he could follow the law and could make a death recommendation. (Doc. 1 at 33.)

The post-conviction court determined that trial counsel did not deficiently perform for failing to object because the comments were not improper. (Doc. 11-10 at 189.) Whether the prosecutor misstated state law is an issue of state law, and a state court's determination of state law receives deference in federal court. *Wilson*, 562 U.S. at 5. <u>*See also Hannon v. State*</u>, 638 So. 2d 39, 41 (Fla. 1994) ("The inability to be impartial about the death penalty is a valid reason to remove a prospective juror for cause."); *Henyard v. State*, 689 So. 2d 239, 250 (Fla. 1996) ("[T]he prosecutor's comments that jurors must recommend death when aggravating circumstances outweigh mitigating circumstances were misstatements of law.").

Also, the post-conviction court determined that Peterson could not demonstrate prejudice because four jurors voted against the death penalty, the trial judge clearly and repeatedly instructed the jury that the jury could consider mitigating facts and circumstances to decide whether a death sentence was appropriate, and the prosecutor repeatedly stressed to potential jurors the importance of following the law. (Doc. 11-10 at 189.) Because the record supports the post-conviction court's determination of facts (Docs. 11-2 at 359–69, 395, 11-3 at 364–66, 11-4 at 23–709, 11-5 at 21–189, 11-12 at 211–21), the post-conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2).

During jury selection, the trial judge instructed potential jurors that, during the penalty phase, the jurors will "consider whether the State has proven the aggravating circumstances, which would allow the imposition of the death penalty, and whether the circumstances which mitigate against death outweigh the aggravating circumstances." (Doc. 11-4 at 464.) During a bench conference before closing argument in the penalty phase, the trial judge prohibited the prosecutor from arguing that the jury must recommend death if the aggravating circumstances outweigh the mitigating circumstances. (Doc. 11-3 at 326–27.) After closing argument in the penalty phase, the trial judge instructed the jury to render an advisory sentence "based upon [their] determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist." (Doc. 11-3 at 360.) Even if the prosecutor misstated state law, Peterson did not demonstrate prejudice, and the post-conviction court did not unreasonably deny the claim. *Darling v. Sec'y, Dep't Corrs.*, 619 F.3d 1279, 1283 (11th Cir. 2010) (holding that the state supreme court reasonably concluded that the jury instructions adequately cured any harm from the prosecutor's misstatements of law during jury selection).

### 2. Failure to object to evidence introduced by the prosecution

Peterson asserts that trial counsel was ineffective for not objecting to testimony by Peterson's girlfriend that she found money underneath the sink and that she observed

38

money in a safe in the home that she shared with Peterson. He asserts that trial counsel deficiently performed by not eliciting testimony from his girlfriend that he regularly won money playing poker and by instead eliciting on cross-examination that Peterson did not have a lot of money.

The post-conviction court denied the claim because the prosecution had no duty to present Peterson's self-serving hearsay explanation of the money, and his girlfriend's testimony about the twenty-five bundles of one-dollar and five-dollar bills was relevant and admissible. (Doc. 11-10 at 190–91.) Whether evidence of the unexplained money was admissible is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985). *See Harrison v. State*, 104 So. 2d 391, 393–94 (Fla. 1st DCA 1958) ("Where the larceny of money is at issue, evidence tending to show the accused had no money before the larceny and considerable money thereafter is admissible, since a sudden and unexplained possession of means about the time a larceny is committed has the tendency to connect the defendant with the crime where there are other circumstances to support it."). Because an objection to testimony by Peterson's girlfriend about the money would not have succeeded, trial counsel was not ineffective. *See Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not be held

to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").[7]

Also, the post-conviction court determined that the introduction of Peterson's hearsay explanation for the money through his girlfriend's testimony could have opened the door to the impeachment of Peterson with thirteen prior convictions. (Doc. 11-10 at 190–91.) Whether admission of Peterson's hearsay explanation could have opened the door to impeachment is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. *See Huggins v. State*, 889 So. 2d 743, 755–56 (Fla. 2004) ("[S]ection 90.806 permits the introduction of a defendant's felony convictions when the defendant elicits his or her own exculpatory, hearsay statement through another witness at trial[.]"). Because Peterson failed to overcome the presumption that trial counsel pursued a reasonable trial strategy by avoiding

---

[7] At trial, Peterson's girlfriend testified that between 1996 and 1998 she was looking for cleaning products under the sink and found a box containing twenty-five bundles of one-dollar and five-dollar bills. (Doc. 11-5 at 558–58, 573–74.) She testified that Peterson worked as a chef at a hotel every day. (Doc. 11-5 at 575–76, 580.) A manager at Phar-Mor testified that she gave the robber one-dollar, five-dollar, and ten-dollar bills wrapped in fifty-dollar, one hundred dollar, and two hundred and fifty-dollar straps. (Doc. 11-6 at 126–27.)

the admission of the harmful impeachment evidence, the state court did not unreasonably apply *Strickland*. 466 U.S. at 689.

Lastly, the post-conviction concluded that trial counsel did not elicit any new damaging evidence on cross-examination. (Doc. 11-10 at 191.) On cross-examination, trial counsel elicited from Peterson's girlfriend that Peterson purchased two cars with financing, Peterson's girlfriend drove one of the cars, Peterson's girlfriend kept money in the safe, and Peterson did not have a lot of money and worked every day during their three-year relationship. (Doc. 11-5 at 575–80.) This testimony tended to prove that Peterson lawfully earned money to pay his bills and did not earn money as a serial robber. Consequently, the post-conviction court reasonably determined (Doc. 11-10 at 191) that trial counsel did not elicit damaging testimony on cross-examination. 28 U.S.C. § 2254(d)(2).

### 3. Failure to object to comments during closing argument, failure to investigate and cross-examine prosecution witnesses, failure to present adequate argument during closing argument, and the failure to present an opening statement

Peterson asserts that trial counsel was ineffective for not objecting to the prosecution's mischaracterization of evidence during closing argument ("sub-claim A"), for failing to elicit from Mary Palmisano, who worked at the Family Dollar, that she could not identify the robber ("sub-claim B"), for failing to cross-examine a detective about the

pressure that he exerted on Palmisano to identify Peterson as the robber and about an internal investigation which determined that the detective had lied about his use of a racial slur ("sub-claim C"), for failing to argue in closing argument that the prosecution had not proven the collateral crimes beyond a reasonable doubt ("sub-claim D"), and for not presenting an opening statement to argue that the prosecution's evidence was weak ("sub-claim E"). (Doc. 1 at 37–39.)

### i. Sub-claim A

Peterson asserts that trial counsel was ineffective for not objecting to the following comment by the prosecutor in closing argument: "I asked [James Davis] if he could make an in-court identification, and he — that's when he said, 'I would have some doubt about doing that,' about making an in-court ID in 2005." (Doc. 1 at 38.) Peterson contends that Davis, who witnessed the Big Lots robbery, testified that he could not identify the robber. (Doc. 1 at 38.) The post-conviction court denied the claim because Davis testified that he was "99 to 100" percent sure of his identification of Peterson from a photographic lineup in 1998, but at the time of trial almost eight years later he could not identify the robber in court. (Doc. 11-10 at 192.) The post-conviction court concluded that trial counsel was not ineffective for failing to object to the prosecutor's fair comment on Davis's testimony. (Doc. 11-10 at 192.)

At trial, Davis testified that, after the 1997 robbery, police twice showed him a photographic lineup and he was unable to identify a suspect. (Doc. 11-6 at 55–56.) In November of 1998, police showed him a third photographic lineup and Davis identified Peterson as the robber and stated that he was "99 to 100 percent" certain. (Doc. 11-6 at 56–57.) At the time of trial in 2005, Davis conceded that "without a doubt" he could not identify the same suspect in person because so many years had passed since the robbery. (Doc. 11-6 at 59.) In closing argument, the prosecutor told the jury that Davis was "99 to 100 percent sure that the photograph that he picked out was, in fact, that of [Peterson]," but that he testified that he "would have some doubt" about identifying the suspect in court. (Doc. 11-6 at 353–54.) Even though Davis testified that "without a doubt" he could not identify Peterson in court and the prosecutor told the jury that Davis expressed "some doubt," the distinction is inconsequential. The prosecutor fairly commented that Davis positively identified Peterson in the photographic lineup and did not identify Peterson in court. *Tuten v. State*, 326 So. 3d 826, 834 (Fla. 1st DCA 2021) ("[A]ttorneys are given wide latitude during closing argument to review the evidence, draw reasonable inferences from the evidence, and advance all legitimate arguments.").

Because the trial court would have overruled an objection to the prosecutor's fair comment, trial counsel was not ineffective for failing to object, and the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297.

43

### ii. Sub-claim B

Peterson asserts that trial counsel was ineffective for failing to elicit from Mary Palmisano, who worked at the Family Dollar, that she could not identify the robber. (Doc. 1 at 38.) He contends that trial counsel failed to cross-examine Palmisano with her testimony in the Family Dollar prosecution that she could not provide a description of the suspect to a police sketch artist because she did not know what the suspect looked like. (Doc. 1 at 38.) He further contends that Palmisano told a detective that she did not see the suspect, but the detective pressured Palmisano to identify a suspect. (Doc. 1 at 38.)

The post-conviction court denied the claim because Palmisano testified at Peterson's trial that she was unable to identify the robber and, consequently, Palmisano did not identify Peterson under duress. (Doc. 11-10 at 193.) Also, the post-conviction court relied on trial counsel's testimony at the evidentiary hearing confirming that he tried to elicit from Palmisano that the detective pressured her to identify a suspect. (Doc. 11-10 at 193.) Trial counsel further opined that the prosecution would have successfully objected to a question about Palmisano's failure to identify the suspect in a photographic lineup. (Doc. 11-10 at 193.)

At trial, Palmisano testified that she was able to see the robber only for "a split second," the robber wore a mask, and she was unable to identify him later. (Doc. 11-5 at 276–77, 280–81.) On cross-examination, Palmisano testified that a detective met with her

and showed her a photographic lineup. (Doc. 11-5 at 295.) Trial counsel attempted to ask her what the detective told her about the photographic lineup, and the prosecutor objected and argued that the subject matter exceeded the scope of direct examination and the question elicited irrelevant testimony. (Doc. 11-5 at 295–96.) At a bench conference (Doc. 11-5 at 295–99), the trial court sustained the objection and prohibited trial counsel from asking Palmisano what the detective told her but allowed trial counsel to ask whether Palmisano was able to identify a suspect. Trial counsel proffered that Palmisano testified in a deposition that she told the detective that the photographic lineup did not contain a photograph of the suspect, and the detective responded, "Well, I don't care. You need to pick somebody out or I'm not leaving." (Doc. 11-5 at 298.)

Because Palmisano did not identify Peterson as the robber at trial, and trial counsel attempted to ask Palmisano about the pressure that the detective exerted when he showed her a photographic lineup, Peterson failed to demonstrate deficient performance. Also, the prosecution introduced DNA evidence which proved that Peterson committed the Family Dollar robbery. (Doc. 11-5 at 300–01, 332–34, 374–377.) Even if trial counsel had impeached Palmisano concerning her identification of the robber, Peterson could not demonstrate a reasonable probability that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694. Consequently, the post-conviction court did not unreasonably deny the claim.

45

### iii. Sub-claim C

Peterson asserts that trial counsel was ineffective for failing to cross-examine a detective about the pressure that he exerted on Palmisano to identify Peterson as the robber and about an internal investigation. (Doc. 1 at 39.) He contends that the internal investigation revealed that the detective had referred to a person as a "sand n*gger" and had lied under oath about using the slur. (Doc. 1 at 39.) He asserts that trial counsel should have investigated and discovered the internal investigation and impeached the detective with the investigation at trial. (Doc. 1 at 39.)

The post-conviction court denied the claim because Palmisano testified that she was unable to identify the robber, and trial counsel attempted to cross-examine the detective about the pressure that he exerted on Palmisano. (Doc. 11-10 at 193.) Also, the post-conviction court relied on trial counsel's testimony at the evidentiary hearing confirming that he attempted to ask the detective about the pressure. (Doc. 11-10 at 193–94.) Trial counsel further opined that an attack on the detective's character based on the isolated incident was unnecessary because the detective was only a chain of custody witness for a blood sample. (Doc. 11-10 at 193–94.)

At trial, the detective testified that he was present when a nurse drew a blood sample from Peterson pursuant to a court order. (Doc. 11-5 at 303–06.) The detective delivered the blood sample to the Florida Department of Law Enforcement for testing. (Doc. 11-5

at 303–04.) Before cross-examination, trial counsel asked the trial judge for permission to question the detective about the pressure that he exerted on Palmisano to identify a suspect in the photographic lineup. (Doc. 11-5 at 307–10.) The trial judge allowed trial counsel to ask a question and agreed to consider an objection. (Doc. 11-5 at 309.) On cross-examination, the detective testified that he showed Palmisano a photographic lineup and confirmed that Palmisano did not identify a suspect. (Doc. 11-5 at 310.) Trial counsel asked the detective, "What did you suggest to her?" (Doc. 11-5 at 310.) The prosecutor objected, and the trial court allowed trial counsel to ask the detective if he suggested to Palmisano that she pick out a suspect. (Doc. 11-5 at 310–12.) Trial counsel asked the detective if he "suggest[ed] to [ ] Palmisano that she had to pick somebody out of the photopack," and the detective responded, "Not that she had to pick somebody out, no." (Doc. 11-5 at 313.) Trial counsel again asked the detective, "You didn't suggest that at all to her, that she had to pick someone," and the detective responded, "No, I did not." (Doc. 11-5 at 313.) Because trial counsel cross-examined the detective about any pressure that he exerted on Palmisano when he showed her the photographic lineup, the post-conviction court did not unreasonably deny the claim.

At the evidentiary hearing, trial counsel testified that he did not question the detective about the internal affairs investigation because the rules of evidence barred the admission of specific conduct to attack the truthfulness of a witness. (Doc. 11-12 at

230–32.) Because "[e]vidence of particular acts of misconduct cannot be introduced to impeach the credibility of a witness," *Farinas v. State*, 569 So. 2d 425, 429 (Fla. 1990), and the trial court would have sustained an objection to trial counsel's impeachment of the detective with the internal investigation, trial counsel did not deficiently perform, and the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297. *See also State v. Bullard*, 858 So. 2d 1189, 1191–92 (Fla. 2d DCA 2003) ("Courts have allowed cross-examination on Internal Affairs investigations where the investigation arose from the same incident as the defendant's criminal charges or, if a defendant claims an officer used excessive force, investigations involving prior incidents of excessive force, but they have refused to allow such evidence when the investigation is completely unrelated to the defendant's case.").

### iv. Sub-claim D

Peterson asserts that trial counsel was ineffective for failing to argue in closing argument that the prosecution had not proven the collateral crimes beyond a reasonable doubt. (Doc. 1 at 39.) The post-conviction court denied the claim because state law requires the prosecution to prove collateral crimes by clear and convincing evidence. (Doc. 11-10 at 199.) The post-conviction court determined that proof of the collateral crimes was overwhelming. (Doc. 11-10 at 199.) Also, the post-conviction court relied on testimony at the evidentiary hearing by trial counsel who explained that his strategy in closing argument

was to argue the lack of evidence proving the charged crime instead of focusing on the strong evidence proving the collateral crimes. (Doc. 11-10 at 199–200.)

Whether the prosecution could prove the collateral crimes with clear and convincing evidence, instead of evidence beyond a reasonable doubt, is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. Because state law did not require the prosecution to prove the collateral crimes beyond a reasonable doubt, trial counsel was not ineffective for failing to present the meritless argument. *Pinkney*, 876 F.3d at 1297. *McLean v. State*, 934 So. 2d 1248, 1256 (Fla. 2006) ("Before allowing [collateral crimes] evidence to be presented to the jury, the trial court must find that the State has proved that the defendant committed the collateral acts by clear and convincing evidence.").

Also, the post-conviction court accurately summarized the overwhelming evidence at trial proving the collateral crimes. DNA from the scene of the Family Dollar robbery matched Peterson's DNA. (Doc. 11-5 at 332–37.) A police officer found a green bank bag from the McCrory's robbery behind a refrigerator in the home of Peterson's father. (Doc. 11-6 at 241–49, 266–71.) Fingerprints on a receipt and on a check in the green bag matched Peterson's fingerprints. (Doc. 11-6 at 282.) A supervisor at McCrory's identified Peterson in a photographic lineup as the robber and identified him in court. (Doc. 11-6 at 263–65, 271–72.) Mitochondrial DNA from hair on electrical tape used to bind the victims

in the Phar-Mor robbery matched Peterson's mitochondrial DNA. (Docs. 11-6 at 213 and 15-2 at 96–97.) Peterson's girlfriend and his girlfriend's brother identified Peterson in surveillance video of the Phar-Mor robbery. (Doc. 11-5 at 569–72 and 11-6 at 101–03.)

Because the prosecution proved the collateral crimes with overwhelming evidence, including DNA evidence, eyewitness identifications, and fingerprint evidence, Peterson failed to demonstrate that trial counsel was ineffective, and the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 687.

### iv. Sub-claim E

Peterson asserts that trial counsel was ineffective for not presenting an opening statement to argue that the prosecution's evidence was weak. (Doc. 1 at 39.) The post-conviction court denied the claim because, at the evidentiary hearing, trial counsel provided strategic reasons for not presenting an opening statement. (Doc. 11-10 at 197–98.)

Trial counsel explained his reasoning as follows: he did not intend to present evidence to exonerate Peterson, would have forfeited the opportunity to present the first and last closing argument by presenting evidence, planned to instead attack the prosecution's evidence, did not want to reveal this strategy in opening statements to the prosecutor, did not know how many of the six collateral crimes the prosecution would introduce into evidence, and would have prejudiced Peterson by commenting on all six collateral crimes. (Doc. 11-10 at 197–98.) The post-conviction court also pointed out that

trial counsel had prepared the jurors for the collateral crimes evidence during jury selection. (Doc. 11-10 at 198.) Because transcripts confirm that trial counsel educated the jurors concerning the collateral crimes during voir dire (Docs. 11-4 at 582–97 and 11-5 at 187–89), presented a first and last closing argument during the guilt phase (Doc. 11-6 at 327–34, 388–400), and testified about his strategic reasons for not presenting an opening statement at the evidentiary hearing (Doc. 11-12 at 172–73, 212–17, 234–35), the post-conviction did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2).

Also, because trial counsel provided reasonable trial strategy for not presenting an opening statement, the state court did not unreasonably apply *Strickland*. 28 U.S.C. § 2254(d)(1). *Strickland*, 466 U.S. at 689. *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir. 1985) ("The attorneys' decision to waive opening argument at the guilty phase was one of reasonable trial strategy. It left the defense uncommitted to a particular position and thus free to develop any defense that might materialize as the State presented its case."); *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985) ("Sawhill's decision not to make an opening statement is understandable in light of the fact that he accomplished during voir dire what most attorneys set out to do in their opening remarks.").

### 4. Stipulation to DNA Evidence in Family Dollar robbery

Peterson asserts that trial counsel was ineffective for not moving to exclude a DNA analyst's testimony at trial describing DNA evidence from the Family Dollar robbery as

"evidence recovered from Palmisano." (Doc. 1 at 40–41.) Peterson contends that this testimony inferred that Peterson raped Palmisano and asserts that trial counsel should have objected and moved for a mistrial. (Doc. 1 at 40–41.) He further contends that trial counsel compounded the prejudice by using Palmisano's name when referring to the DNA evidence on cross-examination. (Doc. 1 at 41.)

The post-conviction court denied the claim because Peterson's contention that the jury inferred that he raped Palmisano was "purely speculative," transcripts showed that the prosecutor carefully tailored his questions and the introduction of the DNA evidence to comply with the stipulation, and trial counsel was not ineffective because the prosecutor did not violate the stipulation. (Doc. 11-10 at 200.) Because the record supports the post-conviction court's determination of facts, the post-conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2).

At trial, the prosecutor carefully questioned Palmisano about the robbery without asking her about the rape. (Doc. 11-5 at 272–94.) During a bench conference at the end of direct examination, the prosecutor advised, "Judge, obviously, I'm not going to—because of the Court's previous rulings and stipulation, I'm not going to go into physical evidence— I'm not going to inquire into the physical evidence that was gotten from the victim, and I would like the Court to read the stipulation at the conclusion of her testimony." (Doc. 11-5 at 291.) The trial judge asked the prosecutor whether he advised Palmisano not to

testify about the rape, and the prosecutor responded, "I've been very careful to tell her we're not going into it, we're not asking it, and you shouldn't be asked about it on cross-examination either." (Doc. 11-5 at 293–94.)

After Palmisano's testimony, the trial judge read a stipulation. (Doc. 11-5 at 300.) The prosecution and the defense stipulated that Palmisano and another employee were robbed by an armed assailant at the Family Dollar store and "[b]iological evidence containing the assailant's DNA was collected under circumstances which the State and [d]efense stipulate [that] this DNA could only have been left by the robber at the time of the crime." (Doc. 11-5 at 300.)

At a bench conference before the DNA analyst's testimony, the prosecutor advised the trial judge that, even though documents pertaining to DNA samples that the analyst examined referred to a sexual assault as the source of the sample, the prosecutor was not going to ask the analyst about the source or show the documents to the jury. (Doc. 11-5 at 319–20.) Also, trial counsel agreed to not ask the DNA analyst about the source of the DNA on cross-examination. (Doc. 11-5 at 320.) The prosecutor carefully questioned the DNA analyst about the "samples" without referring to the rape. (Doc. 11-5 at 332–38.) The prosecutor referred to the samples as the "DNA sample from the crime scene" or "DNA from the crime scene." (Doc. 11-5 at 332, 333, 337, 355–56, 361–64.)

A second DNA analyst testified, and the prosecutor referred to the DNA samples as "evidence from the crime scene in the form of three samples," "DNA samples from the crime scene in the case involving Family Dollar and Mary Palmisano," and "DNA from the crime scene." (Doc. 11-5 at 373, 375, 376.) The prosecutor asked the second DNA analyst for the results from "an analysis on the DNA from the crime scene [ ] with the known DNA sample from Charles Peterson." (Doc. 11-5 at 376–77.) The second DNA analyst responded, "the question sample from Palmisano matched the DNA profile of Charles Peterson." (Doc. 11-5 at 377.) At a bench conference, trial counsel argued that the second DNA analyst's reference to a "sample from Palmisano" strongly suggested that the DNA derived from bodily fluid on Palmisano. (Doc. 11-5 at 377.) The trial judge interpreted the comment as a reference to the "Palmisano case" but still offered to give a cautionary instruction, warning that the instruction could highlight any negative inference even further. (Doc. 11-5 at 378.)

Trial counsel agreed with the prosecutor's suggestion to instead clarify with the witness that the sample derived from the crime scene in the "Palmisano case." (Doc. 11-5 at 378.) The prosecutor dispelled any potential inference to the rape by asking the second DNA analyst: "Referring specifically to the DQ_alpha polymarker test that you did in reference to **the Palmisano case and the DNA sample from the crime scene in that case,** did it match in all six areas that you tested?" (Doc. 11-5 at 379) (bolding added.) The

second DNA analyst responded and clarified: "The DNA profile on all of the six areas tested on the polymarker DQ alpha test were the same on the **crime scene sample** as the known standard from Peterson." (Doc. 11-5 at 379) (bolding added.) On cross-examination, trial counsel carefully referred to the results from the "Family Dollar Palmisano situation" and the "Family Dollar issue." (Doc. 11-5 at 384, 385–86.)

Because (1) the jury heard that the prosecution and the defense stipulated that Palmisano was a victim of an armed robbery at the Family Dollar store—not a rape—and that the armed robber left DNA, (2) both the prosecution and the defense carefully avoided asking witnesses questions which would elicit the testimony concerning the rape, and (3) after the second DNA analyst's ambiguous testimony, the prosecution clarified that the DNA derived from the crime scene, the trial court would have overruled an objection to the testimony and would have denied a motion for mistrial. *Pinkney*, 876 F.3d at 1297. Also, Peterson failed to overcome the presumption that trial counsel's agreement to a clarifying question by the prosecution instead of a cautionary instruction by the trial judge "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Consequently, the post-conviction court did not unreasonably deny the claim. 28 U.S.C. § 2254(d).

### 5. Failure to object to testimony by a fingerprint expert who opined that Peterson's fingerprints were on stolen items

Peterson asserts that trial counsel was ineffective for not objecting to testimony by a fingerprint examiner who testified that a latent print from a receipt from McCrory's matched Peterson's index and middle fingers on his left hand and that a latent print from a check matched a palm print from his right hand. (Doc. 1 at 41–42.) He contends that trial counsel should have consulted and presented testimony by Simon Cole, an expert who would have testified that fingerprint examination lacks scientific validity. (Doc. 1 at 42–43.)

The post-conviction court denied the claim because the victim in the McCrory's robbery identified Peterson in a photographic lineup and at trial, and police found the receipt and the check containing fingerprints behind a refrigerator in the home of Peterson's father. (Doc. 11-10 at 201.) Also, *Johnston v. State*, 70 So. 3d 472, 483–84 (Fla. 2011), rejected a similar claim asserting deficient performance for not calling the fingerprint expert, Cole. (Doc. 11-10 at 201.) *State v. Armstrong*, 920 So. 2d 769, 770–71 (Fla. 3d DCA 2006), also affirmed a trial court's ruling excluding testimony by Cole. (Doc. 11-10 at 201–02.) Lastly, at the post-conviction evidentiary hearing, the fingerprint examiner who testified at trial explained that, at the time of trial, standards in the field required an examiner to either identify or exclude prints without qualification. (Doc.

11-10 at 202.) The post-conviction court concluded that, because the trial court would have excluded testimony by Cole and would have overruled an objection to the fingerprint examiner's testimony, trial counsel did not deficiently perform, and Peterson failed to demonstrate prejudice under *Strickland*. (Doc. 11-10 at 202.)

Whether the trial court would have admitted testimony by Cole is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. *Johnston*, 70 So. 3d at 483–84, explained that "Dr. Cole's opinion as to the reliability of fingerprint evidence had no connection to the latent fingerprints analyzed in this case and was not based on relevant facts." Peterson submitted an affidavit by Cole which confirms that Cole never analyzed the fingerprints that police recovered from the McCrory's robbery in this case. (Doc. 15-2 at 202–10.) Also, *Armstrong*, 920 So. 2d at 771, cited *United States v. Abreu*, 406 F.3d 1304 (11th Cir. 2005), and other federal appellate court opinions, which hold that fingerprint identification expert testimony is reliable. Because the trial court would have excluded testimony by Cole, trial counsel was not ineffective for failing to call Cole as a witness. *Pinkney*, 876 F.3d at 1297.

At the evidentiary hearing, the fingerprint examiner who testified at trial acknowledged that standards governing fingerprint examination changed in 2011. (Doc. 11-11 at 465–67.) During her testimony at trial, the examiner complied with the standards

effective at the time of trial. (Doc. 11-12 at 354–61.) Because the standard changed six years after Peterson's trial, trial counsel was not ineffective for failing to object to the fingerprint examiner's testimony based on the new standard. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Lastly, at trial, a police officer testified that he found a bank bag from the McCrory robbery behind a refrigerator in the garage of the home of Peterson's father. (Doc. 11-6 at 241–49, 266–71.) A supervisor at McCrory's identified Peterson in a photographic lineup as the robber and told a police officer that she was "ninety percent sure." (Doc. 11-6 at 263–65.) Even if trial counsel had successfully rebutted or moved to exclude the fingerprint examiner's testimony, Peterson fails to demonstrate that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694. Consequently, the post-conviction court did not unreasonably deny the claim. 28 U.S.C. § 2254(d).

### 6. Failure to object to the admission of the collateral crimes without proof beyond a reasonable doubt

Peterson asserts that trial counsel was ineffective for not moving to exclude evidence of the collateral crimes because the prosecutor failed to prove the collateral crimes beyond a reasonable doubt. (Doc. 1 at 43.) He asserts that admission of the evidence of the

collateral crimes violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and his federal right to a jury trial. (Doc. 1 at 43.) The post-conviction court denied the claim because neither *Apprendi* nor any other opinion or statute supported Peterson's claim. (Doc. 11-10 at 203.) The post-conviction court determined that "Peterson's suggestion that *Apprendi* [ ] appl[ies] to a preliminary determination of the admissibility of *Williams* rule evidence during the guilt phase is misplaced." (Doc. 11-10 at 203.) The post-conviction court concluded that trial counsel was not ineffective for failing to file a meritless motion. (Doc. 11-10 at 203.)

The indictment charged Peterson with first-degree murder with a firearm. (Doc. 11-2 at 145.) The charge arose from a murder that occurred during the robbery of a Big Lots store. (Doc. 11-2 at 147–49.) Before trial, the prosecutor notified the defense of his intent to introduce evidence that Peterson violently robbed other stores with a firearm. (Doc. 11-2 at 197–204.) At trial, before the prosecutor introduced the similar fact evidence, the trial court instructed the jury to consider the evidence "for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident on the part of the defendant." (Doc. 11-5 at 271–72, 302.) *See also* § 90.404(2)(a), Fla. Stat. ("Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.").

*Apprendi*, 530 U.S. at 490, holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Under Florida law, first-degree murder is a capital felony punishable by either death or life in prison without parole. §§ 775.082(1)(a) and 782.04(1)(a), Fla. Stat. After the jury found Peterson guilty of first-degree murder and recommended a sentence of death, the trial court sentenced Peterson to death. (Doc. 11-3 at 158–78.) The post-conviction court subsequently granted Peterson relief, and the trial court resentenced Peterson to life in prison. (Doc. 11-12 at 750–53.)

Because the jury found Peterson guilty of first-degree murder, Section 775.082(1)(a) required the trial court to impose a sentence of either death or life without parole. Because admission of the collateral crime evidence did not increase the statutory minimum or maximum of Peterson's sentence, *Apprendi* did not require the prosecutor to prove the collateral crime evidence beyond a reasonable doubt. *Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (italics in original)); *Alleyne v. United States*, 570 U.S. 99, 103 (2013)

("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." (citation omitted)).

Because the trial court would have denied a motion based on *Apprendi* to exclude the collateral crimes, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Pinkney*, 876 F.3d at 1297.

> 7. **Failure to move to suppress the witnesses' identification of Peterson in court and failure to present testimony by an eyewitness identification expert**

Peterson asserts that trial counsel was ineffective for not moving to suppress the identifications by Karen Smith who was a manager at Big Lots, Maria Soto who was another manager at Big Lots, James Davis who was a customer at Big Lots, and Ann Weber who was an employee at McCrory's. (Doc. 1 at 43–44.) He contends that the identifications violated his federal right of due process because the witnesses were white and he is black, and the suspect wore a mask during the robberies. (Doc. 1 at 45–46.) He asserts that trial counsel should have retained an expert who would have testified about cross-racial misidentification. (Doc. 1 at 45.)

### a. Failure to present testimony by eyewitness identification expert

The Florida Supreme Court rejected the claim because Peterson failed to demonstrate deficient performance and prejudice. *Peterson*, 154 So. 3d at 282–84. Three witnesses identified Peterson as the robber at Big Lots, including Davis who was a black male and observed Peterson in the store just before the robbery; Soto who identified Peterson by his facial features and clothing and observed him in the store before the robbery; and Smith who identified Peterson in a photographic lineup after the robbery and in court. *Peterson*, 154 So. 3d at 283. The collateral crimes, which involved a signature modus operandi and which the prosecution proved with a combination of DNA evidence, shoeprint and fingerprint evidence, videotape surveillance, and Peterson's possession of stolen items, corroborated the witnesses' identifications of Peterson in the Big Lots robbery. *Id.*

The Florida Supreme Court further relied on testimony by trial counsel at the evidentiary hearing. *Id.* Trial counsel testified that he studied literature by eyewitness identification experts when preparing for his cross-examination of the witnesses. *Id.* Transcripts showed that trial counsel effectively cross-examined the witnesses about the impact of stress, the passage of time, the gun pointed at their faces, and other circumstances on their ability to reliably identify the suspect. *Id.* The court also concluded that testimony by an eyewitness identification expert was cumulative to this cross-examination and "this

is not the type of case in which there was a substantial likelihood of misidentification." *Id.*
Because the record supports the post-conviction court's determination of facts, the post-
conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2).

At trial, Davis testified that he walked to the rear of the Big Lots store on the date
of the robbery and saw a black male pacing back and forth. (Doc. 11-6 at 52–53.) Davis
observed the black male for five minutes while the store was open and lights illuminated
the store. (Doc. 11-6 at 54.) Davis described the black male as five feet, nine or ten inches
tall with a medium build and a thin moustache. (Doc. 11-6 at 54.) Police twice showed
Davis photographic lineups to identify the male whom Davis observed, and Davis told
police that none of the photographs depicted the male. (Doc. 11-6 at 55–56.) About a year
after the robbery, police showed Davis a third photographic lineup, and Davis identified a
photograph of Peterson as the male in the store. (Doc. 11-6 at 56–58.) Davis was ninety
to one hundred percent certain of his identification. (Doc. 11-6 at 58–59.) Davis testified
that he could not identify Peterson at trial because he had observed the male six years
earlier. (Doc. 11-6 at 59.)

Soto testified and described the robber as a black male brandishing a gun and
wearing a stocking covering his face and latex gloves covering his hands. (Doc. 11-6 at
29–31.) Police showed Soto a photographic lineup, and Soto was unable to identify the
robber. (Doc. 11-6 at 39.) Soto testified that she observed a male in the store without a

mask before the robbery wearing the same clothing as the robber. (Doc. 11-6 at 39–40, 48.) Soto identified Peterson in court as the male whom she saw in the store without a mask before the robbery. (Doc. 11-6 at 40–41.) Soto remembered that a customer suspected that the male was stealing merchandise and pointed at the male, and Soto saw the male leave the store. (Doc. 11-6 at 42–43, 47.) The male frightened Soto, and she felt relieved when he left. (Doc. 11-6 at 47.)

Smith testified that she observed a male pointing a gun at her and she could not clearly see his face because he wore a "nylon scarf" on his head. (Doc. 11-5 at 594–95.) Smith could still see the male's facial features through the nylon stretched over his face. (Doc. 11-5 at 595.) The male was black with "pudgy cheeks." (Doc. 11-5 at 595.) While Smith was alone with the male in an office, Smith was able to look at the male's face. (Doc. 11-5 at 610–11, 614.) Lights illuminated the back of the store where Smith saw the male, and Smith's face was about six inches away from the male's face. (Doc. 11-5 at 607.) Ten months after the robbery, Smith met with police to look at a photographic lineup, and Smith identified Peterson as the robber and was "[one] hundred percent" certain. (Doc. 11-5 at 617–19.) Smith identified Peterson as the robber at trial. (Doc. 11-5 at 620–21.)

At the evidentiary hearing, trial counsel testified that he learned how to challenge an eyewitness identification by attending seminars on eyewitness identification and by reading a book by Elizabeth Loftus, an expert on eyewitness identification. (Doc. 11-12 at

123–25.) Trial counsel used methods that he learned from the seminars and the book to challenge the identifications by the witnesses to the Big Lots robbery and had used those methods to challenge eyewitness identifications in other trials. (Doc. 11-12 at 125, 218.)

On cross-examination at trial, trial counsel showed that Davis was unable to describe the lips of the robber and was unable to identify Soto who was working at Big Lots on the day of the robbery and had exited the courtroom just before Davis entered to testify. (Doc. 11-6 at 60–61.) Trial counsel showed that Soto was unable to identify a suspect in a photographic lineup, was unable to describe or identify the police officer who showed her the photographic lineup, and was unable to describe or identify the police officer with whom she spoke about the customer who wore the same clothes as the robber. (Doc. 11-6 at 42–45.) Trial counsel showed that Smith was frightened by the gun during the robbery, had seen a picture of Peterson on the news two or three weeks after the robbery, had testified in her deposition that she was ninety percent (not one hundred percent) certain about her identification, could not remember if the robber had facial hair, and could not describe the robber's nose or the color of the robber's hair and eyes. (Doc. 11-5 at 621–31.)

DNA evidence proved that Peterson committed the Family Dollar robbery (Doc. 11-5 at 332–37) and connected Peterson (or a maternal relative) to the Phar-Mor robbery. (Docs. 11-6 at 213 and 15-2 at 96–97.) A green bank bag from the McCrory's robbery

found behind a refrigerator at the home of Peterson's father (Doc. 11-6 at 245–49) connected Peterson to the McCrory's robbery. Also, fingerprints on documents in the bank bag matched Peterson's fingerprints, and a supervisor at McCrory's identified Peterson as the robber. (Doc. 11-6 at 263–65, 271–72, 282.) Peterson's girlfriend identified Peterson as the robber in surveillance video from Phar-Mor based on clothing that the robber wore and his gait. (Doc. 11-5 at 569–72.)

Because Davis and Soto identified Peterson as an individual at the store just before the robbery, the stress of the robbery would not have impacted their identifications. Trial counsel very effectively cross-examined Smith about the impact of her fright from the gun on the reliability of her identification, about her preview of Peterson's photograph on the news after the robbery, and about her failure to describe other important facial features of the robber. Also, three additional robberies corroborated the three eyewitness identifications establishing that Peterson committed the Big Lots robbery.

Because an eyewitness identification expert's testimony would have been cumulative to trial counsel's cross-examination of the witnesses and Peterson could not demonstrate the outcome at trial would have changed if trial counsel had presented testimony by the expert, the state supreme court did not unreasonably deny the claim. *Morrow v. Warden*, 886 F.3d 1138, 1152 (11th Cir. 2018) ("We see no reason to disturb the determination that this 'cumulative' and 'weak' evidence would not have influenced the jury's assessment

of Morrow. Indeed, Morrow fails to contest that the evidence was cumulative, let alone rebut the findings with 'clear and convincing evidence.'" (citations omitted)). *Reaves v. Sec'y, Fla. Dep't Corrs.*, 872 F.3d 1137, 1157 (11th Cir. 2017) ("As we have said, 'the fact that other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel.'" (citation omitted)).

### b. Failure to move to suppress the witnesses' identification of Peterson

Peterson asserts that trial counsel was ineffective for not moving to suppress the identifications by the eyewitnesses of the Big Lots robbery and the eyewitness of the McCrory's robbery. (Doc. 1 at 43–46.) He contends that admission of the identification testimony violated his federal right to due process because the witnesses were white and the robber was black and the robber wore a mask, undermining the reliability of the identifications. (Doc. 1 at 44–46.)

The Florida Supreme Court denied the claim concerning the eyewitness of the McCrory's robbery because trial counsel testified that he strategically chose not to attack eyewitness identifications in the similar fact robberies because physical evidence proved that Peterson committed those robberies. *Peterson*, 154 So. 3d at 284. At the evidentiary

hearing, trial counsel described the evidence supporting the similar fact robberies as "strong" and explained that he and his co-counsel strategically chose to instead challenge the lack of physical evidence supporting the charged crimes. (Doc. 11-12 at 150–51, 245–46.) A green bank bag from the McCrory's robbery was found behind the refrigerator at the home of Peterson's father and Peterson's fingerprints on documents in the bag proved that Peterson committed the robbery. (Doc. 11-6 at 245–49, 263–65, 271–72, 282.) Because this tangible evidence strongly tied Peterson to the McCrory's robbery, Peterson failed to overcome the presumption that trial counsel pursued "sound trial strategy," and the state supreme court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 689.

The Florida Supreme Court also denied the claim concerning the eyewitnesses of the Big Lots robbery because trial counsel testified that "the focus was to attack the identifications in front of the jury so the jurors could perceive for themselves that the alleged identifications of Peterson were tainted." *Peterson*, 154 So. 3d at 284. At the evidentiary hearing, trial counsel testified that he did not remember whether he discussed with co-counsel moving to suppress the identifications but had unsuccessfully filed similar motions in other cases. (Doc. 11-12 at 232.) Trial counsel instead focused on attacking the eyewitnesses in front of the jury to show that the identifications were tainted. (Doc. 11-12 at 232.) His co-counsel repeatedly described the identifications as tainted during closing argument. (Doc. 11-12 at 232–33.)

The state supreme court did not unreasonably deny this claim. "'[D]ue process concerns arise only when law enforcement officers use[ ] an identification procedure that is *both* suggestive and unnecessary.'" *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012) (italics in original)). "To be impermissibly suggestive, the procedure must give rise to a very substantial likelihood of irreparable misidentification." *Sexton*, 138 S. Ct. at 2559 (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972) (quotations omitted)). "Even when an unnecessarily suggestive procedure was used, 'suppression of the resulting identification is not the inevitable consequence.'" *Sexton*, 138 S. Ct. at 2559 (quoting *Perry*, 565 U.S. at 239). "Instead, the Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." *Sexton*, 138 S. Ct. at 2559 (quoting *Perry*, 565 U.S. at 239) (quotations omitted).

"'[R]eliability [of the eyewitness identification] is the linchpin of that evaluation.'" *Sexton*, 138 S. Ct. at 2559 (quoting *Perry*, 565 U.S. at 239). "The factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" *Sexton*, 138 S. Ct. at 2559 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

69

In his post-conviction motion, his brief after the evidentiary hearing, and his brief on appeal (Docs. 11-8 at 424–28, 11-9 at 121–25, 11-12 at 434–37), Peterson failed to explain how the police improperly and unnecessarily used a suggestive procedure which created a substantial likelihood of misidentification. *Sexton*, 138 S. Ct. at 2559. Peterson instead argued that the eyewitness identifications themselves were weak. (Docs. 11-8 at 424–28, 11-9 at 121–25, 11-12 at 434–37) Neither the race of the eyewitnesses nor the clothing worn by the suspect demonstrated improper police misconduct.

Because Peterson failed to demonstrate that a motion to suppress the eyewitness identifications in the Big Lots robbery would have succeeded and failed to overcome the presumption that trial counsel pursued reasonable strategy by instead attacking the eyewitnesses in front of the jury to show that the identifications were unreliable, the state supreme court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 689. *Perry*, 565 U.S. at 233 ("When no improper law enforcement activity is involved, we hold, it suffices to test reliability through the rights and opportunities generally designed for that purpose, notably, the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.").

8. **Peterson's Right to Due Process, Right to Confrontation, and Right to Effective Assistance of Counsel Concerning the Admission of the Similar Fact Evidence**

Peterson asserts that the prosecution violated his federal right to due process by relying on statements by Darrell Sermons, a not credible witness, to secure admission of the similar fact evidence and by failing to disclose to the trial court Sermons's lack of credibility ("sub-claim A"), trial counsel was ineffective for not requesting an evidentiary hearing on the admission of the similar fact evidence so that the trial court could assess the credibility of witnesses and determine whether clear and convincing evidence proved the similar fact evidence ("sub-claim B"), trial counsel was ineffective for not moving for reconsideration of the ruling admitting the similar fact evidence after receiving grand jury testimony by Sermons ("sub-claim C"), and trial counsel was ineffective for not moving for a mistrial after the prosecution failed to introduce at trial all the evidence that the prosecution had introduced to prove the similar fact evidence at the pretrial hearing ("sub-claim D"). (Doc. 1 at 52–53.)

a. **Sub-claims A and C**

Peterson asserts that the prosecution violated his federal right to due process by relying on statements by Sermons to establish a predicate for the admission of the similar fact evidence and by failing to disclose to the trial court Sermons's lack of credibility. (Doc.

1 at 52.) Peterson further claims that trial counsel was ineffective for not moving for reconsideration of the ruling admitting the similar fact evidence after receiving grand jury testimony by Sermons. (Doc. 1 at 52.)

The post-conviction court denied these claims because evidence other than Sermons's proved the similar fact evidence, and Sermons did not testify at trial. (Doc. 11-10 at 208.) The post-conviction court further denied these claims because the prosecution disclosed to the defense Sermons's grand jury testimony before trial, and Sermons vacillated during his testimony before the grand jury. (Doc. 11-10 at 208–09.)

Before trial, the prosecution prepared a memorandum which identified clear and convincing evidence, other than Sermons's testimony, proving that Peterson committed the Family Dollar, Phar-Mor, and McCrory's robberies. (Doc. 15-2 at 573–74.) For the Family Dollar robbery, the prosecution identified DNA evidence. (Doc. 15-2 at 573–74.) For the Phar-Mor robbery, the prosecution identified mitochondrial DNA evidence, surveillance video, an identification by Peterson's ex-girlfriend, and a Tommy Hilfiger shirt worn by the robber in the surveillance video seized from Peterson's storage locker. (Doc. 15-2 at 574.) For the McCrory's robbery, the prosecution identified an eyewitness who identified Peterson with ninety percent certainty, documents from McCrory's with the date of the robbery seized from the home of Peterson's father, and Peterson's fingerprints on the documents. (Doc. 15-2 at 574.) DNA reports, depositions attended by both the

prosecutor and defense counsel, police reports, and photographic lineups in the state court record confirm that the prosecution presented evidence, other than Sermons's statements, to prove that Peterson committed the robberies. (Doc. 11-7 at 57–58, 68–79, 284–87, 300–01, 311–12, 316–17, 363–64, 384–85, 388.)

Before trial, the defense moved to exclude the grand jury testimony of Sermons because Sermons had recanted his statements to police and the prosecution intended to introduce Sermons's grand jury testimony at trial. (Doc. 15-2 at 882–84.) The trial judge held a hearing on the motion and heard argument from the parties. (Doc. 15-2 at 1139–55.) At the same hearing, the trial judge advised the parties that she had inherited the case from a predecessor judge who had ruled that the similar fact evidence was admissible, asked the parties questions about the similar fact evidence, and indicated that she would conduct her own review of the record to determine whether the similar fact evidence was admissible. (Doc. 15-2 at 1119–29.) During jury selection, the trial judge raised the issue again, advised that she had "fully and thoroughly reviewed the file," prohibited the prosecution from admitting a Walgreen's robbery because the prosecution had not proven the robbery with clear and convincing evidence, and asked the prosecutor to provide a summary of the similarities between the Family Dollar robbery and the charged crime. (Doc. 11-5 at 240–43.)

During the summary, the prosecutor conceded that "we don't know exactly what Mr. Sermon[s] would testify to," and acknowledged that the purpose of the similar fact evidence "may have changed somewhat in the change of Mr. Sermon[s]'s testimony." (Doc. 11-5 at 246–47.) Trial counsel responded, "[the prosecution] [has] a couple witnesses that claim to [identify] Mr. Peterson here and maybe, maybe not, Mr. Sermon[s]." (Doc. 11-5 at 249.) After hearing argument from the parties, and learning about the unreliability of Sermons's testimony, the successor judge adopted the predecessor judge's ruling admitting the remaining similar fact evidence. (Doc. 11-5 at 249–50.) Trial transcripts confirm that Sermons did not testify at trial, and the prosecution did not introduce Sermons's grand jury testimony. (Doc. 11-4 at 6–10.) At trial, the DNA evidence, surveillance video, fingerprint evidence, and other tangible evidence proved that Peterson committed the armed robberies.

Because a motion for reconsideration based on Sermons's grand jury testimony would not have succeeded and the state court record supports the post-conviction court's ruling, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. 28 U.S.C. § 2254(d). *Pinkney*, 876 F.3d at 1297. *United States v. Agurs*, 427 U.S. 97, 103 (1976) ("The rule of *Brady v. Maryland*, 373 U.S. 83 (1963), arguably applies in three quite different situations. Each involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense."). *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276–77 (11th Cir. 2005) ("*Giglio* [*v. United*

74

*States*, 405 U.S. 150 (1972),] error is a species of *Brady* error that occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'") (quoting *Agurs*, 427 U.S. at 103).

### b. Sub-claim B

Peterson asserts that trial counsel was ineffective for not requesting an evidentiary hearing on the admission of the similar fact evidence so that the trial court could assess the credibility of witnesses and determine whether clear and convincing evidence proved the similar fact evidence. (Doc. 1 at 52.) The post-conviction court acknowledged this claim (Doc. 11-10 at 207) but failed to explain its ruling on the claim. A federal habeas court presumes that the post-conviction court adjudicated the claim on the merits. *Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted."). Peterson must demonstrate no reasonable basis for the post-conviction court's denial of relief. *Richter*, 562 U.S. at 98.

In his post-conviction motion and brief after the evidentiary hearing (Docs. 11-8 at 428–33 and 11-9 at 145–55), Peterson failed to identify any witness, other than Sermons, whose credibility that trial counsel could have impeached at an evidentiary hearing. As

explained above, even without Sermons's testimony, the trial court would have admitted the similar fact evidence. Also, DNA evidence, surveillance video, fingerprint evidence, and other tangible evidence—which did not call into question the credibility of a witness—proved the similar fact evidence. Even if trial counsel had requested an evidentiary hearing, the trial court would have still ruled that clear and convincing evidence proved the similar fact evidence, and the outcome at trial would not have changed. Consequently, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

And if this Court must review the claim de novo under the theory that the state court failed to adjudicate the claim entirely, the result is the same: the similar fact evidence was damning and would have been admitted at trial. Thus, there is no basis to conclude that the outcome would have differed.

### c. Sub-claim D

Lastly, Peterson asserts that trial counsel was ineffective for not moving for a mistrial after the prosecution "did not admit evidence of the other similar fact [ ] cases that the [prosecution] initially relied on to convince the [ ] court to allow the admission of [ ] most of the similar fact [ ] cases." (Doc. 1 at 52.)

The post-conviction court denied this claim because the prosecution initially moved to admit as similar fact evidence six robberies from the 1990s and other robberies from the 1980s. (Doc. 11-10 at 209.) The trial court excluded the robberies from the 1980s, and the

prosecution presented three of the remaining six robberies at trial. (Doc. 11-10 at 209.) The post-conviction court determined that, if the prosecution had admitted all six remaining robberies, the similar fact evidence "could easily have become a feature of the trial." (Doc. 11-10 at 209.) The post-conviction court concluded that trial counsel did not deficiently perform by failing to request that the prosecution present evidence of *more* robberies, and Peterson could not demonstrate prejudice under *Strickland*. (Doc. 11-10 at 209.)

At the similar fact evidence hearing before the predecessor judge, the prosecution initially moved to admit six armed robberies from the late 1990s and three armed robberies from the early 1980s. (Docs. 11-6 at 409–14 and 15-2 at 971–91.) The predecessor judge ruled that the prosecution could introduce evidence of the six armed robberies from the late 1990s but could not introduce evidence of the three armed robberies from the early 1980s. (Doc. 15-2 at 1005–08.) After the successor judge reviewed the predecessor judge's ruling before trial, the successor judge further ruled that the prosecution could not introduce evidence of one of the six robberies from the late 1990s, a Walgreens robbery. (Doc. 11-5 at 241–42.) At trial, the prosecution introduced evidence of three of the remaining five robberies from the late 1990s. *Peterson*, 2 So. 3d at 149–51.

Because evidence of the two other robberies would have only bolstered the prosecution's case, and clear and convincing evidence proved that Peterson committed the

three robberies admitted at trial, trial counsel was not ineffective, and the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 689.

Ground three is denied.

### D. Ground Four

Peterson asserts that errors during the guilt and penalty phases of his trial cumulatively justify relief. (Doc. 1 at 64.) The state supreme court denied this claim because Peterson "[did] not demonstrate[ ] that he is entitled to relief on any of the claims he [ ] raised." *Peterson*, 154 So. 3d at 284 n.1. Because Peterson fails to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, he is not entitled to relief. *Morris v. Sec'y, Dep't Corrs.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (stating that when none of the individual claims of error have merit, "we have nothing to accumulate").

Ground four is denied.

### E. Ground Five

Peterson asserts that appellate counsel was ineffective for conceding on direct appeal that Peterson committed the collateral offenses. (Doc. 1 at 65–67.) In *Peterson*, 2 So. 3d at 153, the opinion affirming Peterson's conviction, the Florida Supreme Court acknowledged appellate counsel's misstatement as follows:

Peterson does not dispute that he committed the collateral robberies. His appellate counsel informed this Court that Peterson was either convicted or pled guilty to each collateral robbery. Instead, Peterson argues that the Family Dollar, Phar–Mor, and McCrory's robberies were not sufficiently factually similar to the charged offense to be relevant and that the collateral crime evidence improperly became a feature of the trial. After reviewing the record, we find that the trial court did not abuse its discretion in allowing the collateral crime evidence.

The Florida Supreme Court determined that appellate counsel deficiently performed. *Peterson*, 154 So. 3d at 284–85. Peterson was charged and convicted only for the Family Dollar robbery, and appellate counsel incorrectly informed the state supreme court on direct appeal that Peterson pleaded guilty to, or a jury found Peterson guilty of, all three robberies. *Peterson*, 154 So. 3d at 285–84.

However, the Florida Supreme Court denied the ineffective assistance of appellate counsel claim because Peterson could not demonstrate that appellate counsel's misstatement prejudiced him. *Peterson*, 154 So. 3d at 285. The trial court "found that there was clear and convincing evidence that Peterson was the perpetrator in the three collateral cases," and the court had affirmed Peterson's conviction on direct appeal on "substantially identical factual findings." *Id.* at 285.

The state supreme court did not unreasonably deny the ineffective assistance of appellate counsel claim. Peterson did not argue on direct appeal that the prosecution had failed to prove that he committed the collateral crimes by clear and convincing evidence. Also, as explained above, clear and convincing evidence in fact proved that Peterson committed the three robberies. In the opinion on direct appeal, the state supreme court accurately summarized the evidence that clearly and convincingly proved that Peterson committed the three robberies. *Peterson*, 3 So. 3d at 149–51. Consequently, the state supreme court did not unreasonably conclude that Peterson failed to demonstrate prejudice under *Strickland*. 466 U.S. at 694. *Shere v. Sec'y, Fla. Dep't Corrs.*, 537 F.3d 1304, 1310 (11th Cir. 2008).

Ground five is denied.

## V. <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Peterson must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Peterson has not made the requisite showing. Finally, because Peterson is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Peterson's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Peterson and in Respondents' favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on October 11, 2023.

_Kathryn Kimball Mizelle_
Kathryn Kimball Mizelle
United States District Judge

81